UNITED STATES of America, Plaintiff–Appellant (93–2495/2531), Cross–Appellee,

v.

Friedrich R. "Fred" KOHLBACH, Defendant–Appellee,

Edward B. CROUSE, Defendant–Appellee, Cross–Appellant (93–2550),

James R. MARSHALL, Defendant–Appellant (93–2564).

Nos. 93–2495, 93–2531, 93–2550 and 93–2564.

United States Court of Appeals, Sixth Circuit.

Argued June 23, 1994.

Decided Oct. 19, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 14, 1994 in Nos. 93–2531, 93–2550, 93–2564.

Brian K. Delaney (argued and briefed), Office of the U.S. Atty., Grand Rapids, MI, Jay I. Bratt (argued and briefed), U.S. Dept. of Justice, Washington, DC, for plaintiff-appellant.

Charles S. Rominger, Jr. (argued and briefed), Grand Rapids, MI, for Friedrich R. Kohlbach.

David A. Dodge (argued and briefed), Grand Rapids, MI, for Edward B. Crouse.

Craig W. Haehnel (argued and briefed), Grand Rapids, MI, for James R. Marshall.

Before: KEITH, BOGGS, and BATCHELDER, Circuit Judges.

BOGGS, Circuit Judge.

Defendants Kohlbach, Crouse, and Marshall pleaded guilty to federal charges arising from a conspiracy to produce and introduce into interstate commerce adulterated "orange juice made from concentrate." The government appeals from the sentences imposed on Kohlbach and Crouse, claiming that they were lighter than mandated by the United States Sentencing Guidelines. Crouse cross-appeals, and Marshall appeals, both claiming that the district judge incorrectly determined the total loss caused by the conspiracy, and consequently imposed a sentence harsher than that authorized by the guidelines. For the reasons set forth below, we: (1) remand the matter of Kohlbach's sentencing to the district court for further findings of fact; (2) vacate Crouse's sentence and remand for resentencing; and (3) affirm the findings of loss because they are not clearly erroneous.

## I

Kohlbach, Crouse, and Marshall were named among seven persons and two corporations charged in a 33–count indictment with conspiring to violate the Federal Food, Drug, and Cosmetic Act ("FDCA") by selling adulterated orange drinks as "orange juice from concentrate." The Food and Drug Administration ("FDA") is authorized by Congress to establish definitions and standards for food products whenever "such action will promote honesty and fair dealing in the interest of the consumer...." 21 U.S.C. § 341.

The FDA has chosen to define standards for orange juice. Under 21 C.F.R. § 146.145, "orange juice from concentrate" may consist only of water, concentrated orange juice, orange juice, orange pulp, orange oil, and orange aroma (also called "orange essence"). Thus, it is forbidden to add sugar, pulpwash,[1] citric acid, amino

---

1. Orange pulpwash is a term of art that refers to the liquid that remains after water has been forced through the residue of juice processing. Such residue includes the skin, the peel, the pulp, and other solids that remain after the juice has been squeezed from oranges during processing.

acids, enzymes, or preservatives to a product called "orange juice from concentrate." Under the law, it is not relevant whether the forbidden additives improve the product's quality. As a separate but related matter, the antibiotic natamycin (marketed under the trade name "Delvocid") has been approved by the FDA for use on the surface of cheese but in no other food substance. *See* 21 C.F.R. § 172.155.

Flavor Fresh Foods, Inc. ("Flavor Fresh"), contracted with the Peninsular Products Company ("Peninsular") to process Flavor Fresh's "100% orange juice from concentrate" by adding the appropriate amount of water, and to pack and market the finished product. Defendant Marshall was one of Flavor Fresh's owners and a company vice-president. Marshall had been in the orange juice business for three decades. Sometime around the early 1970s, he developed formulas for adulterating orange juice. During this period, he first met defendant Kohlbach, a German scientist specializing in food biology.

Meanwhile, Peninsular also produced and distributed its own in-house "orange juice from concentrate," marketed as "Orchard Grove." Defendant Crouse was the owner of Peninsular, the chairman of its board of directors, and its chief executive officer. Crouse delegated responsibility for Peninsular's day-to-day activities to others, especially co-conspirator Wagoner, Peninsular's general manager.[2] While Wagoner ran Peninsular's operation from the company's main office in Michigan, Crouse increased his presence in Florida, where he had an office, monitoring groves and developing financial information. Crouse still visited Michigan periodically during the year, to attend Peninsular's quarterly board meetings and to pursue other personal charitable, civic, and religious interests. Nevertheless, Wagoner kept Crouse apprised of the company's adulterating schemes, and Crouse understood that Peninsular was violating federal law.

According to the indictment, Flavor Fresh first began to dilute its "100% orange juice from concentrate" by adding beet sugar and by infusing other additives, including amino acids and flavor enhancers, to foil federal detection. Subsequently, Marshall contracted with Kohlbach to purchase, and to market to others, a sophisticated preservative that could extend the shelf life of "orange juice from concentrate" from four weeks to as long as seven weeks.

Kohlbach devised and supplied the preservative, whose main ingredient was glucose oxidase/catalase, a natural enzyme that extends the product's life by inhibiting oxidation. Kohlbach's preservative also included natamycin, an antibiotic that further extends shelf life by killing microbes and molds that are present in orange juice concentrate. Kohlbach described his compound as being so potent that it contained "one bullet for every bug." By adopting this method to extend product shelf life, Flavor Fresh and Peninsular saved costs by eliminating the need to sanitize and upgrade their production facilities, and they further avoided the losses that their competitors incur when the shelf life of unadulterated orange products expires. In addition, Kohlbach sold and provided maintenance service for a "dosing machine" that he created to inject measured amounts of preservative into the concentrate, and he devised a formula by which enough extra orange aroma was added into the enzyme-and-natamycin additives to mask the alterations. He shipped his preservative to Flavor Fresh, invoicing it as a "cleansing and aseptisizing compound." In turn, Flavor Fresh sold some of the preservative to Peninsular, shipping it as a "flavoring compound."

Shortly after Flavor Fresh began working with Peninsular in 1979, Marshall informed Wagoner that he was adulterating his concentrate by adding beet sugar. Nevertheless, Peninsular continued to market it as "100% orange juice from concentrate." In fact, around 1983, Peninsular chose to increase the profit margin on its own in-house "Orchard Grove" label by purchasing adulterated concentrate from Flavor Fresh. In time, Peninsular obtained more than three million gallons of the Flavor Fresh concentrate, the base ingredient from which it produced approximately 37 million gallons of

---

**2.** Wagoner was convicted and sentenced in separate proceedings that are not part of this appeal.

finished product. In 1990, Peninsular began adding pulpwash to its concentrate. However, in early 1991, an FDA inspector caught Peninsular employees adding the pulpwash. An investigation followed, leading to criminal indictments against Defendants.

The Food, Drug, and Cosmetic Act makes it a federal crime to "adulterate" a food by substituting a component, or by adding any substance to it that "reduce[s] its quality or strength, or [that] make[s] it appear better or of greater value than it· is." 21 U.S.C. § 342(b). It is also a federal offense to introduce "adulterated or misbranded" food into interstate commerce. *Id.* § 331(a). Section 333(a)(2) makes it a felony to violate § 331(a) while acting "with the intent to defraud or mislead."

Desiring to avoid trial on the 33-count indictment, Kohlbach and Crouse both pleaded guilty to count 15 only, admitting that, with the intent to defraud or mislead, they caused adulterated orange juice to be introduced into interstate commerce. 21 U.S.C. §§ 331(a), 333(b) (recodified as § 333(a)(2) after July 22, 1988). Marshall pleaded guilty both to that count and to count one, conspiracy to violate the FDCA. 21 U.S.C. § 371. The defendants were sentenced separately, and the issues on this appeal arise from those sentences.

## II

Kohlbach pleaded guilty to count 15 of the indictment, which charged that with the intent to defraud or mislead, he caused adulterated orange juice to be introduced into interstate commerce. 21 U.S.C. §§ 331(a), 333(b) (recodified as § 333(a)(2) after July 22, 1988). It was agreed by the parties that, based on the dates of his offenses, he would be sentenced under the 1987 guidelines.

■ Under U.S.S.G. § 2F1.1(a), an offender whose crime involves fraud or deceit is assigned a base offense level of 6. That offense level is further increased based on the amount of loss caused, with incremental sen-

tencing enhancements pegged to higher thresholds of loss. When a district court calculates the amount of loss caused by a crime involving fraud or deceit, the court need not determine the amount of loss with precision. *United States v. Milligan,* 17 F.3d 177, 183 (6th Cir.1994) (citing § 2F1.1, comment. (n.8)). "The guidelines require a district court to make a reasonable estimate, which may be founded on general factors such as the nature and duration of the fraud." *Ibid.*

■ The government urged the district judge to adopt the recommendation of the Pre–Sentencing Investigation (PSI) that Kohlbach's base offense level of 6 under U.S.S.G. § 2N2.1(b)(1)(1987) be enhanced by 11 levels under § 2F1.1(b)(1)(L)(1987) for the specific offense of perpetrating a fraud that exceeded $5 million. The judge refused, finding that it would "turn the statute on its head" to enhance Kohlbach's offense level based on a quantity of criminality to which he had "no proprietary nexus of gain." Furthermore, because the judge was satisfied that no one had been hurt by Kohlbach, he rejected the government's suggestion to add two levels under U.S.S.G. § 2F1.1(b)(2)(B)(1987), for a crime to defraud more than one victim. On the other hand, the judge did agree to enhance the base offense level by two on the grounds that Kohlbach's crime required the use of special skill related to his scientific knowledge. U.S.S.G. § 3B1.3. Thus, the district judge found a total offense level of 8 for Kohlbach's crimes, rejecting the government's argument for finding a base offense level of 21.

In rejecting the government's suggestion that he impose the statutory maximum sentence of three years,[3] the judge opined that 21 U.S.C. § 333(a)(2) contemplates more serious offenses than Kohlbach's, and he described the law as a class E felony and a "minor statute." He sentenced Kohlbach to eight months of home confinement, one year of supervised release, and a $100,000 fine.[4]

---

3. The sentencing range for a defendant with a criminal history in category I, and a total offense level of 21, is 37–46 months.

4. The 1987 guidelines indicate a sentence of 2–8 months for an offense level of 8 and a criminal history category I. A criminal in that range may

The judge further ordered Kohlbach to leave the United States after serving his sentence and paying his fine, and recommended that Kohlbach be barred from future entry.

The record reflects that the judge perceived Kohlbach as a scientist of some standing who had been consulted on matters relating to food preservation and who did not intend to cause loss. Moreover, Kohlbach had no connection with the decision to infuse beet sugar into the orange juice concentrate. Rather, he provided the enzymes and antibiotics that extended shelf life while inhibiting microbes, molds, and oxidation. In an exchange with the government's attorney at the sentencing hearing, the district judge persistently explored whether Kohlbach's role had actually harmed anyone:

> THE COURT: Did the preservative work as was anticipated?
>
> MR. BRATT [the government attorney]: It worked tremendously well, Your Honor....
>
> THE COURT: And the harm to the public?
>
> MR. BRATT: The harm to the public is that the public wants to buy a product that—
>
> THE COURT: Harm to the public.
>
> MR. BRATT: The harm to the public—
>
> THE COURT: Danger, health hazards to the public.
>
> MR. BRATT: This was never charged as—the harm is purely economical.
>
> THE COURT: Well, we're beyond what's being charged.... My question to you is harm to the public, physical endangerment of health. I think that's what the whole FDA is premised on, harm to the public.
>
> MR. BRATT: Your Honor, I would beg to differ in this area.
>
> THE COURT: Excuse me. Answer my question, Mr. Bratt.
>
> MR. BRATT: There was *no harm to the public* as far as we know. We have not charged that.
>
> THE COURT: Okay. You may continue.

J.A. at 299–300 (emphasis added). Furthermore, the judge noted Kohlbach's dignified demeanor throughout the proceedings.

Nevertheless, although the judge felt that Kohlbach played a smaller role and benefited less from the scheme than did the other defendants, our review of the record indicates that Kohlbach may have profited significantly from payments that he received as a consultant, from the marketing of his preservative to Marshall, and from the sale and maintenance of his "dosing machine" and related equipment. Unfortunately, the record on appeal sheds no light on whether, or to what degree, he profited from this venture. Nor does the record reflect the monetary amount of loss caused by Kohlbach's fraud and deceit. Therefore, we remand this matter to the district judge for further findings of fact to determine, based on the amount of loss caused by Kohlbach's fraud, whether Kohlbach's offense level should have been enhanced under the terms of U.S.S.G. § 2F1.1(b)(1).

### III

Like Kohlbach, Crouse was sentenced under the 1987 guidelines. The PSI recommended that Crouse be assigned a total offense level of 23, comprised of: (1) a base offense level of 6 for violating the FDCA, U.S.S.G. §§ 2N2.1; 2F1.1(a); (2) a specific-offense level increase of 11 because the amount of loss caused by the fraud was approximately $10.3 million, an amount in excess of $5 million, *id.* § 2F1.1(b)(1)(L); (3) a 2–level enhancement for perpetrating a scheme to defraud more than one victim, *id.* § 2F1.1(b)(2)(B); (4) a 4–level enhancement for being the organizer or leader of a criminal activity that involved five or more persons, *id.* § 3B1.1(a); (5) a 2–level enhancement for obstructing justice by making false statements to the grand jury that investigated the charges leading to the indictment, *id.* § 3C1.1; and (6) a 2–level reduction for accepting responsibility, *id.* § 3E1.1(a). A total offense level of 23, with a criminal history category of I, carries a guidelines sentencing range of 46–57 months. However, the statutory ceiling for this class E felony would limit

be sentenced to home confinement. *See* U.S.S.G. § 5C1.1(c), (e).

Crouse's prison term to a maximum of 36 months. 21 U.S.C. § 333(a)(2); U.S.S.G. § 5G1.1(a).

■ Despite the government's recommendation, the district judge departed downward. The judge, who noted for the record that he had personally been an active participant in the community life of Lansing, Michigan, earlier in his career, commented on Crouse's prominent role in that community. The judge had received a substantial number of letters from religious, civic, and legal figures, appealing for mercy; the letters spoke of Crouse's good deeds and claimed that he had previously manifested high ethical behavior and a sterling character, even when conducting personal business dealings.

The judge found that Crouse's community ties, civic and charitable deeds, and prior good works merited a substantial downward departure in sentence, even though such considerations "are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. §§ 5H1.6, 5H1.11. Furthermore, the judge noted that Crouse had lost his equity interest in the multi-million-dollar business that he had built;[5] had been forced to resign as director of a bank, suffering both embarrassment and the loss of director's fees; had been compelled to give up other prominent positions of communal leadership; and had suffered the anguish of seeing his name deeply tarnished in a community where his reputation had once been sterling. Moreover, the judge explained that he strove for proportionality in sentencing, in light of other sentences being handed down to co-conspirators.

■ Consequently, the district judge sentenced Crouse to a 12-month term of home confinement. The judge also assessed a $250,000 fine. Although at first he did not make itemized offense-level findings under the guidelines, the judge acceded to the government's request that he do so, and he found a total offense level of 19, comprised of: (1) a base offense level of 6 for violation of the FDCA, U.S.S.G. § 2N2.1(a); (2) an 11-level specific-offense increase for a fraud that caused over $5 million in losses, id. § 2F1.1(b)(1)(L); (3) a 2-level enhancement, apparently under id. § 3B1.1(c),[6] for playing a leadership role that was less extensive than that described by the government; (4) a 2-level enhancement for more than minimal planning, id. § 2F1.1(b)(2)(A); and (5) a 2-level reduction for acceptance of responsibility, id. § 3E1.1(a). The judge found that Crouse had not intended to lie to the grand jury when he incorrectly answered a brief flurry of questions; indeed, the judge criticized the questions as being constructed in a complex and unclear manner.[7]

5. The government notes that Crouse enjoyed good wages during the height of the scheme: $139,814 (1983); $194,126 (1984); $238,184 (1985); $401,600 (1986), and $610,067 (1987).

The government challenges the finding that Crouse lost equity in his business as a result of the scandal. In 1989, before the crimes had come to light, the business had been audited, and its value had been approximated at less than $3 million. Crouse sold the business in 1992 for $3.5 million. Thus, Peninsular's value held up through the scandal. In any event, it is not unusual that a business built in significant part on fraud will suffer once the fraud stops.

6. U.S.S.G. § 3B1.1(c) calls for a two-level enhancement if a defendant was an organizer, leader, manager, or supervisor in a criminal activity that did not involve at least five participants and that was not "otherwise extensive." If the criminal activity did involve five or more participants or was "otherwise extensive," the enhancement is three levels for a "manager or supervisor," id. § 3B1.1(b), or four levels for an "organizer or

leader," id. § 3B1.1(a). Although this case clearly involved five or more participants and was quite extensive, the government has not appealed this aspect of Crouse's sentencing. Indeed, the government specifically cites Crouse's two-level enhancement as an appropriate way by which the district judge differentiated between the relative culpability of Crouse and Marshall. See Brief for Appellant (No. 93–2531) at 28.

7. Crouse had been asked, "Prior to March of 1991, did you have any personal knowledge of adulterants being used in the products at Peninsular Products including pulpwash, sugars, antibiotics, preservatives, Delvocid?" (Emphasis added.) He responded negatively. The judge found that such a reply could have been honest if Crouse intended by his answer to convey that Peninsular had not added all five adulterants. Furthermore, the judge found that Crouse could have understood "personal knowledge" to imply a level of first-hand involvement that he had not undertaken. Elaborating, the judge explained that, while he knew that President John F. Ken-

The guidelines assign a sentencing range of 30–37 months for a criminal with a total offense level of 19 and a criminal history category I. Home confinement is not a sentencing option in that sentencing range. Having sentenced Crouse to only 12 months' home confinement, the district judge then stated, for the record, that he was departing downward by six levels, based on the § 5H1 factors, in order to reach a sentencing range that encompasses a 12–month sentence.[8] However, as the government later argued, the judge had departed even lower, *de facto,* because the guidelines do not allow home confinement as a prison substitute for offense level 13. *See* U.S.S.G. § 5C1.1.

 The government appeals from Crouse's lenient sentence, citing this court's prior opinions that a defendant's socio-economic status may not be the basis for a departure. *United States v. Rutana,* 932 F.2d 1155, 1158 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991). Rather, to justify a downward departure based on "unusual factors" that the guidelines have already considered, such as those considered in § 5H1, a district court must find those factors to be present "substantially in excess of that which is *ordinarily involved in the offense of conviction."* *United States v. Brewer,* 899 F.2d 503, 506 (6th Cir.) (emphasis added), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). In this case, the district judge made such a determination.

 In reviewing the sentence, we apply our three-step *Joan* analysis. *United States v. Joan,* 883 F.2d 491, 494 (6th Cir.1989); *see also United States v. Fletcher,* 15 F.3d 553, 556 (1994). We first determine "whether the case is sufficiently unusual to warrant a departure." *United States v. Barnes,* 910 F.2d 1342, 1345 (6th Cir.1990). In other words, we ask whether the district court relied upon

circumstances that are "of a kind or degree that may appropriately be relied upon to justify departure." *United States v. Belanger,* 892 F.2d 473, 475 (6th Cir.1989). This inquiry is a question of law that we review *de novo.* Second, we consider whether the circumstances that would warrant departure "actually exist" in the present case. This assessment involves factfinding, and the district court's determinations are reviewed only for clear error. Finally, if necessary, this court "measure[s the district court's] degree and direction of departure from the Guidelines" to determine whether it meets a standard of reasonableness. *Ibid.*

In this case, focusing on the first two steps of the *Joan* test, the government argues that Crouse's community ties, civic and charitable deeds, and prior good works were not "substantially in excess of that which is ordinarily involved in the offense of conviction." We need not reach the second and third steps of the *Joan* test because we agree that the circumstances on which the district judge relied to depart below the guidelines were not of a sufficiently unusual kind or degree that warranted a departure. Rather, it is *usual* and *ordinary,* in the prosecution of similar white-collar crimes involving high-ranking corporate executives such as Crouse, to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts. *See, e.g., United States v. McHan,* 920 F.2d 244, 248 (4th Cir.1990) (criticizing the notion that white-collar criminals "need only write out a few checks to charities and then indignantly demand" sentencing reductions, and further observing that the "very idea of such purchases of lower sentences is unsavory").

Indeed, in one recent case, a white-collar criminal contributed $1 million to the missionary efforts of Mother Teresa, the Nobel

---

nedy had been assassinated in Dallas, Texas, on November 22, 1963, he would not go so far as to say that he had "personal knowledge" of those events.

In addition, the judge observed that Crouse had come before the grand jury under a subpoena *duces tecum,* not expecting to be further interrogated. Therefore, it would be understandable that Crouse might have failed to understand the

scope or implications of the flurry of questions asked. Although the government appeals from the judge's finding that Crouse did not *intend* to obstruct justice by lying to the grand jury, we do not consider this finding to be clearly erroneous.

8. Under criminal history category I, an offense level of 13 calls for a prison term of 12–18 months. The next higher offense level prescribes a term of 15–21 months.

Peace Laureate.[9] Subsequently, both Mother Teresa and a representative of the Vatican wrote letters to the sentencing judge, attesting to the convicted banker's charitable works and integrity. *See* Ted Johnson & Anne Michaud, "Buyers of Bonds Remain Bitter, Unsatisfied," *L.A. Times*, Apr. 11, 1992, at A1:6. Similarly, in this case, the government augments its appeal from Crouse's comparatively light sentence by showing that co-defendant Marshall's associates and acquaintances also wrote testimonial letters, showering encomia upon *him* for *his* charitable works, community involvements, public good deeds, and church activities. The government contends that such letters did not prevent Marshall from receiving a prison sentence, and similar correspondence should not benefit Crouse either.

We agree that the sentencing guidelines already considered the nature of white-collar crime and criminals when setting the offense levels that govern this offense. Furthermore, the guidelines reward defendants who have lived previously lawful lives by setting substantially lower sentencing ranges for them than those suggested for past offenders. For example, Crouse faces a prison term that is less than half the sentence he would face if he had accrued thirteen or more criminal history points.

The record shows that Crouse has performed many fine deeds in his life and has won the devotion and admiration of people whom he has helped and who have honored him with positions of community leadership. However, he also has derived well over $1 million in income from Peninsular during the years of the adulteration scheme. *See supra* note 5. He has also victimized orange juice

drinkers in Lansing. Indeed, Wagoner conceded earlier that Lansing school children were served Crouse's product with their government-subsidized lunches. By serving a sentence within the range prescribed by the guidelines, he will do no more than pay an outstanding debt, one that he owes the society that gave him the opportunity to achieve success.

## IV

■ Crouse cross-appeals, and Marshall appeals, from the district judge's specific-offense findings that the scheme resulted in a loss that exceeded $10 million. Those findings resulted in an 11–level increase in Crouse's total offense level (based on the 1987 guidelines) and in a 15–level increase in Marshall's total offense level (based on the 1992 guidelines, under which the parties agreed that Marshall would be sentenced).[10]

### A

The judge found the amount of loss by accepting the "ingredient-substitution method," a mathematical formula proposed by the government. The government presented statistics showing the *wholesale* price per pound of pure orange concentrate ("orange juice soluble solids") during the time of the conspiracy, and the *wholesale* price per pound of invert beet sugar during that period.[11] The government then showed that at least 36,616,814 gallons of adulterated orange juice had been produced by the conspirators between 1984 and 1990, and that at least 9,571,033 pounds of sugar were in those adulterated gallons of orange juice. By multiply-

9. *See generally* David B. Fischer, "Bank Director Liability Under FIRREA: A New Defense for Directors and Officers of Insolvent Depository Institutions—or a Tighter Noose?" 39 *UCLA L.Rev.* 1703, 1707 n. 21 (1992) (discussing Charles H. Keating, Jr., and the failed Lincoln Savings & Loan Association of Irvine, California).

10. The 1987 guidelines, under which Crouse was sentenced, provide: a 9–level increase for offenses involving fraud and deceit that result in losses exceeding $1 million; a 10–level increase for losses exceeding $2 million; and an 11–level increase for losses exceeding $5 million. U.S.S.G. § 2F1.1(b)(1)(J)-(L)(1987). The 1992

guidelines, under which Marshall was sentenced, add 12 levels for losses exceeding $1,500,000; 13 levels for losses exceeding $2,500,000; 14 levels for losses exceeding $5,000,000; and 15 levels for losses exceeding $10,000,000. U.S.S.G. § 2F1.1(b)(1)(M)-(P)(1992).

11. The government's evidence showed that the price of orange juice tended to fluctuate between $1.00 and $2.00 per pound of soluble solids during the period of the conspiracy. During that same time frame, bulk refined beet sugar sold within a relatively steady range between $0.30 and $0.35 per pound.

ing the minimum pounds of sugar that were contained in the adulterated mixtures, by the difference in the wholesale price per pound between orange juice soluble solids and bulk refined beet sugar, the judge determined that the conspiracy had resulted in losses to consumers of approximately $10.3 million.

Crouse and Marshall appeal from the method adopted by the judge, noting that the government had earlier persuaded a different district judge, who had sentenced other co-conspirators including Wagoner, to use the "retail-price method," a different mathematical formula. In those prior cases, the government had presented statistics contrasting the *retail* price per gallon of pure orange *juice* and the *retail* price per gallon of orange *drink*. Those calculations showed a $45 million loss. The government suggested to Crouse's and Marshall's probation officers that they use the same "retail-price method" in preparing the defendants' PSIs. However, Crouse and Marshall pointed out that the government had been contrasting the retail price of premium, brand-name, nationally advertised orange juice, such as "Tropicana" and "Minute Maid," as opposed to the retail price of "Sunny Delight," a lower-quality orange drink that contained less than 10% real fruit juice in its ingredients. Defendants' attorneys argued that the judge should instead consider the average retail price of generic, low-priced, private-label orange juice and contrast those numbers to the retail price of higher-priced orange drinks that contain greater percentages of real fruit juice. Defendants' attorneys contended that Flavor Fresh's and Peninsular's juice products were in the private-label family and that their diluted final products still contained more than 60%, often as much as 75%, pure orange juice.

The government first responded by submitting a reduced retail price of orange juice, taken directly from *The Marketing Fact Book*, based on all orange juice retail sales in the United States. Under this formula, the loss still came to $26 million. However, the defendants' attorneys responded that the new statistic was still heavily weighted by the premium brands, which account for 60% of the nation's orange juice sales, and thus remained an unrealistic comparison for Flavor Fresh and Peninsular.

Consequently, the government presented and the judge accepted the alternative "ingredient-substitution method" described above, by which the *wholesale* price per pound of invert beet sugar is subtracted from the price of pure orange concentrate, then multiplied by the pounds of sugar estimated to have been added to the 37 million gallons of adulterated juice, in order to arrive at the $10.3 million loss that the district judge ultimately adopted.

On cross-appeal, Crouse claims first that consumers suffered no losses. He cites at least three orange *drinks* with high amounts of real juice that bore higher retail prices than did private-label orange juice from concentrate. Therefore, he argues that consumers who purchased Flavor Fresh's or Peninsular's adulterated "orange juice from concentrate" would have *saved money* by buying defendants' products, which could have been sold as orange drink and which still contained more real juice than did the three higher-priced orange *drinks*. However, the government presented statistics from a survey conducted by the A.C. Nielsen company for the Florida Department of Citrus, showing that 66% of consumers who purchase orange *juice* would not knowingly accept orange *drink* as a substitute. Therefore, if consumers realized that Flavor Fresh's and Peninsular's products were orange *drink*, not orange *juice*, they would be more likely to turn to other *juice* products than to other *drink* products, even if, in the eyes of some marketers and economists, they should have happily taken the adulterated Flavor Fresh. Furthermore, the three higher-priced orange drinks proffered by Defendants for comparison—"Tropicana Twister," "5–Alive," and "Hi–C"—are themselves name-brand, nationally advertised products, in contrast to the Flavor Fresh and Peninsular products.

Second, Crouse argues that this court should ultimately regard all of the various government estimates and statistics to be grossly speculative. Crouse notes that some defendants were sentenced on the basis of $45 million in losses (using the retail prices of premium, name-brand orange juice), and oth-

ers on the basis of $10.3 million in losses (using the wholesale prices of orange concentrate and invert beet sugar). Furthermore, Crouse points to other statistics that were propounded, showing everything from $26 million in losses (using the national average retail price found in *The Market Fact Book*) to a figure of under $2 million, based only on the losses suffered by Flavor Fresh's and Peninsular's business competitors. Therefore, Crouse claims that "it is clear that the estimates are the product of guess, speculation, and conjecture."

## B

In reviewing on appeal the district court's determination that Crouse and Marshall caused more than $10 million in losses by their deceit and fraud, we again note that "[l]oss need not be determined with precision." *Milligan*, 17 F.3d at 183; U.S.S.G. § 2F1.1, comment. (n.8). In allowing the district judge a measure of latitude in determining the amount of loss caused by a crime that involves fraud or deceit, we have stated:

The guidelines require a district court to make a reasonable estimate, which may be founded on general factors such as the nature and duration of the fraud.

The sentencing guidelines define a product's fair market value as the value of the victim's loss, and in situations involving fraud, to determine fair market value the district court may consider probable or intended loss.

*Ibid.* (citations omitted); *accord United States v. Tardiff*, 969 F.2d 1283, 1288 (1st Cir.1992) ("Under the best of circumstances, a defendant who challenges such a finding has an uphill struggle.... [H]e must carry the burden of satisfying us that the court's evaluation of the loss was not only inexact, but was outside the universe of acceptable computations.").

We review a district court's interpretation and application of the sentencing guidelines *de novo*. After determining the meaning and scope of the guidelines, we review the district court's factual findings underlying the sentence for clear error. *United States v. Robinson*, 898 F.2d 1111, 1116 (6th Cir.1990).

Upon our review of the district court's application of the "ingredient-substitution method" in this case, we cannot say that the court's determination of loss was clearly erroneous. The government presented documented wholesale prices and detailed statistical analyses. Although Crouse and Marshall point to discrepancies in different analyses of loss, those differences are attributable to different theories of which loss to measure. Furthermore, the government's numbers did not consider the additional losses perpetrated by the defendants, who also used their same illegal processes to adulterate *other fruit drinks* they produced, including adulterated apple juice, adulterated grapefruit juice, adulterated pineapple juice, adulterated cranberry juice, and adulterated grape juice. Moreover, the government's statistics gauged the loss beginning only from 1983 because there were no records that showed the amount of adulterated juice that had been shipped between 1979, when the conspiracy began, until 1983. And the government statistics also did not include the losses caused in 1990 and 1991 when Peninsular diluted its concentrate with pulpwash. Therefore, we cannot say that the judge, in finding that Crouse's and Marshall's fraud caused more than $10 million in losses, was "clearly erroneous."

Marshall further argues that, even if the "ingredient-substitution method" is not clearly erroneous, the wholesale price of orange concentrate should have been offset by *all of the ingredients* added into the Flavor Fresh and Peninsular drinks. Thus, in addition to deducting the wholesale price of invert beet sugar, the government and district judge should have subtracted the wholesale prices of such other additives as the amino acids, vitamins, and flavor enhancers that went into the product substituting for the pure concentrate. On one level, Marshall's argument seems reasonable. Beet sugar alone did not replace the reduced concentrate. However, we agree with the government that Marshall's request is akin to a securities-fraud criminal asking the court to offset the expenses incurred in creating, printing, and mailing the false securities. Indeed, in this case, certain flavor enhancers and additives were infused primarily to conceal from con-

sumers and the government the fact that pure orange content had been reduced in the finished product.

## V

For the foregoing reasons, we REMAND the matter of Kohlbach's sentencing to the district court for further findings of fact consistent with this opinion. We VACATE Crouse's sentence and REMAND for resentencing consistent with this opinion. Finally, we AFFIRM the district judge's findings concerning the amount of loss caused by the fraud of Marshall and Crouse, and we thus AFFIRM Marshall's sentence.