RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0328A (6th Cir.)
File Name: 04a0328a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.                                              No. 02-6013

P.G. RAITHATHA,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 00-00041—Karl S. Forester, Chief District Judge.

Argued: January 29, 2004

Decided and Filed: September 29, 2004

Before: MERRITT and SUTTON, Circuit Judges;
FEIKENS, District Judge.*

———————

**COUNSEL**

**ARGUED:** Glenn V. Whitaker, VORYS, SATER,
SEYMOUR & PEASE, Cincinnati, Ohio, for Appellant.

———

* The Honorable John Feikens, United States District Judge for the Eastern District of Michigan, sitting by designation.

David P. Grise, ASSISTANT UNITED STATES
ATTORNEY, Lexington, Kentucky, for Appellee.
**ON BRIEF:** Glenn V. Whitaker, Eric W. Richardson,
VORYS, SATER, SEYMOUR & PEASE, Cincinnati, Ohio,
for Appellant. David P. Grise, Charles P. Wisdom, Jr.,
ASSISTANT UNITED STATES ATTORNEYS, Lexington,
Kentucky, for Appellee.

———————

**AMENDED OPINION**

———————

FEIKENS, District Judge.

## I. INTRODUCTION

Defendant, Dr. P.G. Raithatha, was convicted by a jury of
scheming to defraud private health insurance companies and
Medicare/Medicaid, in violation of 18 U.S.C. §1347, and of
making false statements to the Department of Labor (DOL)
and to the Immigration and Naturalization Service (INS), in
violation of 18 U.S.C. §1001. Defendant was sentenced to 27
months of imprisonment. Defendant appeals his conviction
and sentence.

On appeal, Defendant argues: (1) the jury's conviction as
to all counts should be reversed because Defendant alleges
there is insufficient evidence to sustain his conviction, or
alternatively, that Defendant should be granted a new trial;
and (2) the district court erred in attributing any loss figure to
Defendant as to Counts 1 through 20, and that therefore the
district court's loss calculations for sentencing purposes
should be reversed.[1]

———

[1]On May 19, 2004, this Court issued an Opinion affirming
Defendant's conviction and sentence. Subsequently, on June 2, 2004,
Defendant filed a Petition for Panel Rehearing. Now, in accordance with
Rule 40(a)(4) of the Federal Rules of Appellate Procedure, this Court

## II.    FACTUAL BACKGROUND

### A.    Defendant's Medical Practice

Defendant is a physician who owned and operated two clinics in 1997, the McKee Medical Center in McKee, Kentucky, and the Richmond Medical Center in Richmond, Kentucky. In 1997, defendant sold the clinics to Mountain After Hours Clinic Corporation ("MAHC"). As part of the sale, defendant became an employee of MAHC and was issued one-sixth of the shares of stock in MAHC. By 1998, MAHC owned four other clinics in Hazard, Nicholson, London, and Somerset, Kentucky.

During 1997, when defendant owned the McKee and Richmond clinics, the billing for both clinics was done at the McKee clinic. Tammy Spurlock, defendant's office manager, testified that she, Beverly Lainhart, and Renee Hudson did billing work. Between January and December of 1998, all billing for the six MAHC clinics was performed by an outside billing service, Office Management Services ("OMS"). In April of 1999, OMS stopped providing billing services for MAHC, and the McKee clinic began doing billing for all of the clinics.

To bill its services, a medical clinic issues an invoice to the patient's insurer that contains a current procedure terminology ("CPT") code. The CPT code indicates to the insurer the level of service rendered by the clinic and the amount of reimbursement owed to the clinic. When a medical practitioner sees a patient, the practitioner records a CPT code on an "encounter form" to record the services performed. The CPT codes for established patients range from the least expensive, 99211, to the most expensive, 99215. The CPT codes for new patients range from the least expensive, 99201,

to the most expensive, 99205. (Cost. Tr. 53.) One type of "up-coding" scheme occurs where the CPT numbers are changed on the encounter forms and/or billing sheets sent to the insurance companies so that it appears as if the clinic performed more expensive services than were actually provided.

In 1998, defendant helped recruit seven foreign physicians for MAHC. Defendant recruited them under a program that allows foreign doctors to stay in the United States if they secure employment in medically under-served areas. Under this program, MAHC had to meet several requirements including submitting a Labor Condition Application ("LCA") to the DOL, and a Petition for Nonimmigrant Worker (an "I-129 form") to the INS, setting forth information such as the physician's wage, for each physician hired. MAHC was required to pay each foreign doctor no less than the prevailing wage for the area – the average wage paid to physicians in the area for comparable work.

The McKee clinic was designated a "rural health clinic" by Medicare. As a rural health clinic, the McKee clinic was reimbursed a flat rate for each Medicare/Medicaid patient it saw, regardless of the treatment rendered. The McKee clinic was required to submit to Medicare a yearly "cost report" – a summation of the costs incurred by the clinic in treating patients. Once a clinic reached the maximum reimbursement rate set by Medicare/Medicaid, additional expenses on the cost report were not reimbursed during that year. However, reported costs were used to calculate future Medicare/Medicaid reimbursement rates per patient. (Shreve, Tr. 100.)

In May 1998, a cost report was prepared for the McKee clinic for the period of October 1, 1996 through September 30, 1997, which included $50,393.53 of defendant's personal expenses. Defendant alleges that when defendant operated as a sole proprietor of the Richmond and McKee clinics, prior to their purchase by MAHC, defendant

"often used business checks to pay personal expenses and would, at the end of the year, separate the personal and business expenses in order to prepare the corporation's tax returns." (Def. Br. 113.) Defendant contends that his personal expenses were inadvertently included on the cost report.

### B.   Prosecution of Defendant

On July 24, 2000, a twenty-count indictment was filed against Defendant. Counts 1 and 4 charged Defendant with defrauding private insurance companies in 1997 (Count 1) and 1998 and 1999 (Count 4), in violation of 18 U.S.C. §1347. Counts 1 and 4 charged Defendant with instructing billing staff to: (a) raise the CPT codes on invoices when the physician had reported a lower level of service; (b) submit invoices to insurance companies for services performed by other physicians, as if Defendant had performed them; and (c) submit claims with a diagnosis listing an illness, when the patient did not have an illness. (Indictment, 2-3, 8-10.)

Counts 2 and 5 charged Defendant with scheming to defraud Medicare/Medicaid in 1997 (Count 2) and 1998 and 1999 (Count 5), in violation of 18 U.S.C. §1347. (Indictment, 4-6, 10-12.) Counts 2 and 5 charged Defendant with causing patients to present themselves for medically-unnecessary visits by: (a) refusing to authorize refills on prescriptions and preventing employees from authorizing refills of prescriptions; (b) making unannounced and unrequested home visits to patients; (c) approaching people on the street and ushering them into the clinic for unscheduled examinations; (d) examining people who had come into the clinic for non-medical reasons, such as to pay debts owed to Defendant; (e) ordering medical tests not related to patients' conditions; (f) falsely representing that other physician employees had specialties so that patients would be examined an additional time by a "specialist"; and (g) refusing to give test results until an additional appointment was kept. (Indictment, 4-6, 10-12.)

Count 3 charged Defendant with defrauding Medicare/Medicaid, in violation of 18 U.S.C. §1347, by submitting a cost report for 1997 that included personal expenses unrelated to patient care. Included in those expenses was money which was actually spent to furnish and complete Defendant's home. (Indictment, 6-7.)

Counts 6 through 13 charged Defendant with submitting false statements to the DOL, in violation of 18 U.S.C. §1001, by submitting LCAs that misstated the salaries of seven foreign physicians employed by MAHC. The indictment charged defendant as "the person in charge of recruiting physicians for the Corporation." (Indictment, 12.) The indictment alleged that the "forms falsely overstated the salary to be paid to the physicians, in order to disguise the fact that the physicians were being paid less than the required amount." (Indictment, 13.)

Counts 14 through 20 charged Defendant with submitting false statements to the INS, in violation of 18 U.S.C. §1001, by submitting I-129 forms that misstated the salaries of the seven foreign physicians identified in Counts 6 through 13. (Indictment, 15-16.)

Defendant pleaded not guilty to all counts.

Trial began on July 2, 2001, before Chief Judge Karl S. Forester. Defendant moved for a judgment of acquittal. The district court denied the motion. On July 19, 2001, the jury returned a guilty verdict as to all counts (Counts 1 through 20). Defendant timely moved for a new trial. On September 12, 2001, the district court denied the motion for a new trial. This appeal followed, both as to Defendant's conviction and sentence as to all counts.

### C. Presentence Investigation Report (PSR) Loss Calculation

The probation office determined that it would be difficult to discern an actual loss figure for Counts 1 and 4, but that an intended loss figure could be calculated "for the up-coding conduct which occurred in 1999." Therefore, the PSR calculated an intended loss figure of $206,461.43 for Counts 1 and 4, based on evidence of defendant's up-coding scheme. The PSR calculated an intended loss figure of $50,393.53 for Count 3, equal to the amount of defendant's personal expenses which were included in the cost report submitted to Medicare/Medicaid. The probation office determined that an intended loss amount for Counts 2 and 5, related to defrauding Medicare/Medicaid, could not be quantified. Thus, the PSR recommended that a total intended loss figure of $256,854.96 ($206,461.43 + $50,393.53) should be attributed to defendant as to Counts 1 through 5.

The PSR arrived at the intended loss figure of $206,461.43 for Counts 1 and 4 through a complex series of ten steps. First, the probation office went through encounter forms seized from the McKee Medical Center on November 17, 1999, and extracted all of the encounter forms from 1999 for patients with private insurance that were marked with 99211, 99212, 99201, and 99202 CPT codes. Second, the encounter forms in each CPT code category were counted. Third, of the sixty-four private insurance companies billed by MAHC in 1999, a sample of ten insurance companies were contacted to determine their usual and customary charges for each CPT code.

Fourth, using the customary charges for each CPT code at each of the ten selected insurance companies, the probation office computed the payment difference that would have resulted had each category of CPT codes been up-coded and billed at a higher CPT code. For example, the probation office calculated the payment difference between 99211 to 99213 to determine the amount of loss each of the ten

insurance companies would have suffered had encounter forms marked with a 99211 been up-coded and billed under a 99213 CPT code. The probation office determined the payment differences between the following additional CPT categories for each of the ten insurance companies: 99212 to 99213, 99201 to 99203, and 99202 to 99203.

Fifth, an average payment difference was computed for each of the above categories of possible CPT up-codes. For example, the probation office determined that the average payment difference between services coded 99211 and 99213 was $28.24. (PSR, ¶50-54.) Sixth, the number of encounter forms in each CPT category (determined in step 2) was multiplied by the average payment difference for each category (determined in step 5) to calculate an intended loss figure for each category of CPT codes. For example, for CPT code 99211, the probation office calculated an intended loss figure for 1999 of $35,221.10 by multiplying $28.45 (the average payment difference between 99211 and 99213) by 1,238 (the number of 99211 encounter forms for 1999 seized from the McKee Clinic). Seventh, the intended loss figures for each CPT category were added together to come up with a total intended loss figure for 1999 of $112,820.45. This figure represents the loss which would have occurred had each claim in each CPT category for 1999 been up-coded. (PSR, ¶55-56.)

Eighth, the probation office determined an intended loss figure for 1998 of $56,410.23, by backtracking from the intended loss figure calculated for 1999. The probation office determined that defendant had "extensive control" over the billing of three of the six clinics in the MAHC system during 1998, when the billing for MAHC was conducted by OMS. (PSR, ¶57.) Therefore, the probation office calculated the intended loss figure for 1998 by multiplying the intended loss figure for 1999 by 50%.

Ninth, the probation office determined an intended loss figure for 1997 of $37,230.75. Since defendant operated only

two clinics in 1997, the probation office calculated an intended loss for 1997 by multiplying the intended loss figure for 1999 by 33%. (PSR, ¶58.) Finally, the probation office added together its intended loss calculations for 1999, 1998, and 1997 to arrive at a total loss calculation of $206,461.53 for Counts 1 and 4. (PSR, ¶59.)

For Counts 6 through 20, the probation office calculated an actual loss figure of $216,833.94. (PSR, ¶73.) This was based on the amount of pay the foreign physicians were entitled to but did not receive during their employment with MAHC. (PSR, ¶73.) For Counts 6 through 20, the probation office calculated an intended loss of $523,670.00. This figure equals the difference between the wage reported to the United States minus the contract amount, multiplied by the number of years of the contract, for each foreign physician. This intended loss amount represents the amount of money per contract that MAHC stood to gain by illegally paying its foreign physicians below the prevailing wage. The probation office used the intended loss calculation for Counts 6 through 20 ($523,670.00), because it was greater than the calculated actual loss, and combined it with the intended loss calculation for Counts 1 through 5 ($256,854.96) to calculate a total intended loss figure for Counts 1 through 20 of $780,524.96.

Based on this loss calculation, the probation office recommended a total offense level of 20. U.S.S.G §2F1.1 calls for a base offense level of 6 for violations of 18 U.S.C. §1347 and §1001. The PSR recommended a 10 level increase because the intended loss totaled more than $500,000 but less than $800,000. U.S.S.G. §2F1.1(b)(1)(K). The PSR recommended a 2 level increase because the offense included more than minimal planning, and an additional 2 level increase because the abuse of a private trust facilitated the offense. Thus the PSR recommended a base offense level of 6 plus a 14 level increase, for a total offense level of 20. Based on the recommended total offense level of 20 and Defendant's criminal history category of I, the PSR

recommended a guideline range for imprisonment of 33 to 41 months.

## D. Defendant's Sentencing

On August 2, 2002, the district court sentenced Defendant to 27 months. The district court did not order restitution. (Sentencing, Tr., 37.) The district court adopted the PSR's calculation of an intended loss of $206,461.43 for Counts 1 and 4, and an intended loss of $50,393.53 for Count 3, for a total intended loss of $256,854.96 for Counts 1 through 5.

With regards to Counts 6 through 20, the district court adopted the PSR's actual loss calculation of $216,833.94, after determining that the intended loss calculation relating to Counts 6 through 20 was too speculative. (Sentencing, Tr. 77-80.) However, because the court determined that the conduct charged in Counts 6 through 20 fell outside the heartland of cases that U.S.S.G. §2F1.1 (the applicable Sentencing Guideline) was designed to address, the court decided not to hold Defendant accountable for the actual loss caused by his alleged conduct in Counts 6 through 20. Accordingly, the district court determined that the total loss attributable to Defendant was $256,854.96 (the intended loss calculated for Counts 1 through 5 minus the actual loss calculated for Counts 6 through 20).

Applying U.S.S.G. §2F1.1, the district court determined that the base offense level was 6, and added 4 points as recommended in the PSR because the offense involved more than minimal planning and the violation of a private trust. The district court added an 8 level increase because the amount of loss it determined was attributable to Defendant was above $200,000 and below $350,000. U.S.S.G. §2F1.1(b)(1)(I). Thus, the district court assessed a total offense level of 18, for which the applicable guideline range was 27 to 33 months. (Sentencing Tr. 86.) The district court sentenced Defendant to 27 months of imprisonment and two years supervised release on each count to be served

concurrently. (Sentencing Tr. 95.) Now Defendant appeals both his conviction and sentence as to all counts.

## III. ANALYSIS

### A. SUFFICIENCY OF EVIDENCE

#### 1. Standard of Review

When evaluating a claim of insufficient evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *U.S. v. Harris*, 293 F.3d 970, 974 (6th Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)(emphasis in original)). A defendant claiming insufficiency of evidence bears a "very heavy burden." *US v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986). "[C]ircumstantial evidence alone can sustain a guilty verdict." *US v. Ellerbee*, 73 F.3d 105, 107 n.2 (6th Cir. 1996) (citation omitted). The evidence need not remove every possible hypothesis except that of guilt. *US v. Williams*, 195 F.3d 824, 826 (6th Cir. 1999) (citations omitted).

#### 2. Health Care Fraud (Counts 1-5) – 18 U.S.C. §1347

To convict a defendant of health care fraud under 18 U.S.C. §1347, the Government must demonstrate that the defendant: (1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud. (Jury Instruction No. 12, July 19, 2001.) The defendant must have intended, through some deception, "to induce another to part with property or to surrender some legal right." *US v. Frost*,

125 F.3d 346, 354 (6th Cir. 1997) (*cited in US v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)).

Defendant argues there is insufficient evidence to sustain his conviction for Counts 1 and 4, defrauding or attempting to defraud private health insurance companies. However, many staff members testified that Defendant instructed them to bill office visits covered by private insurance under CPT codes 99213 or 99203, regardless of the CPT code entered by the attending physician on the encounter form. The staff members were aware that this "up-coding" scheme resulted in higher reimbursement from private insurance companies. (Justice, Tr. 164.) After the FBI searched the McKee clinic and Defendant's home and seized encounter forms, insurance information, and records, staff members testified that the up-coding ceased. (Howard, Tr. 76-77.)

In addition, staff members testified that Defendant routinely ordered tests unrelated to his patients' conditions and supported the tests with false diagnoses. (Meadors, Tr. 5-10.) Zeren, a nurse practitioner working at the McKee clinic, testified that after she performed sports physicals on children at local schools and found no indication of upper-respiratory infections, Defendant, who had not been present at the examinations, falsely diagnosed them as having upper respiratory infections. (Zeren, Tr. 45-51.) Taking this evidence in the light most favorable to the prosecution, a reasonable juror could have found Defendant guilty of defrauding or attempting to defraud private insurance companies, as charged in Counts 1 and 4.

Defendant argues there is insufficient evidence to sustain his conviction for Counts 2 and 5, defrauding Medicare/Medicaid by causing patients to come into Defendant's clinics for medically unnecessary examinations or treatments. However, physicians working for Defendant testified that Defendant told them to bring Medicaid patients back for additional office visits, instead of giving them a prescription with refills, so that Medicaid could be billed for

additional visits. (Patel, Tr. 25-26.) Staff members testified that when business was slow, Defendant solicited patients from the street and billed them as office visits. (Justice, Tr. 183.) Staff members testified that people would come into the office for purposes unrelated to receiving medical care, such as paying debts to Defendant, and "before they left, they were a patient," and billed as a patient. (Amon, Tr. 114.) Taking this evidence in the light most favorable to the prosecution, a reasonable juror could have found Defendant guilty of defrauding or attempting to defraud Medicare/Medicaid, as charged in Counts 2 and 5.

Defendant also argues there is insufficient evidence to sustain his conviction for Count 3, defrauding Medicare/Medicaid by including personal expenses in a cost report submitted to Medicare/Medicaid for the McKee Clinic in 1997. The cost report included expenses for Defendant's personal residence totaling $50,393.53. Though Defendant did not sign the report, he was given an opportunity to review it before it was submitted. (Lynn, Tr. 131-132.) When Defendant purchased a TV and stereo system for his residence he instructed the salesman to issue the invoice to the McKee Clinic, as if the items had been purchased by the clinic and not for Defendant's personal use. (Miller, Tr. 203; Ware, Tr.198.) Taking this evidence in the light most favorable to the prosecution, a reasonable juror could have found that Defendant intended to defraud Medicare/Medicaid by including personal expenses on the cost report submitted to Medicare/Medicaid.[2]

---

[2]In Defendant's Petition for Panel Rehearing, Defendant inappropriately attempts to reargue the sufficiency of the evidence underlying his convictions. This Court adequately addressed and rejected Defendant's arguments regarding the sufficiency of the evidence in its Opinion, by summarizing the evidence against Defendant and citing, by way of example, to the testimony of a few of the many witnesses who provided testimony supporting Defendant's convictions. It is clear that after taking all of the evidence in the record in the light most favorable to the prosecution, a reasonable juror could have found Defendant guilty of

### 3.  Making False Statements (Counts 6-20) – 18 U.S.C. §1001

In order to establish a violation of 18 U.S.C. §1001, the Government must demonstrate that: (1) the defendant made a statement; (2) the statement is false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency. *US v. Logan*, 250 F.3d 350, 361 (6th Cir. 2001) (citations omitted). A statement is "material" if it "has the natural tendency to influence, or is capable of influencing, the federal agency." *Id*. at 361 (citations omitted).

Defendant argues there is insufficient evidence to sustain his conviction for making false statements or causing false statements to be made to the DOL and the INS, regarding the salaries of seven foreign physicians employed by MAHC. For each foreign physician hired, MAHC was required to file an LCA with the DOL and an I-129 form with the INS stating the employee's prevailing wage salary. The evidence demonstrated that the submitted LCAs and I-129 forms overstated the salary MAHC actually paid the foreign physicians. Defendant's payroll manager testified that she signed the LCAs and I-129 forms at Defendant's direction. (Bowling, Tr. 13.)

In addition, several foreign physicians testified to Defendant's role in making contracts with the physicians, after the forms had been submitted to the DOL and the INS, that reduced the physician's salary from that stated on the submitted forms. (Dani, Tr. 37-39.) One physician testified that Defendant threatened her with visa problems when she questioned having to sign an amendment to her original contract (for $110,000/year) which reduced her salary to $70,000/year. (Ravisankar, Tr. 6-9.) Taking this evidence in

---

Counts 1 through 5.

the light most favorable to the prosecution, a reasonable juror could have found that defendant was guilty of intentionally causing false statements to be made to the DOL and INS.

Defendant argues that his conviction on Counts 7 and 15, charging defendant with causing false statements to be made to the DOL and INS about one of the foreign physicians, Dr. Vivek Patel, should be reversed. Defendant contends that the forms submitted by the government are forms which were actually prepared and submitted for Dr. Divya Joshi, and not for Patel. With regard to defendant's contention as to Counts 7 and 15, the record is abundantly clear that such false statements were made. Defendant's contention that certain forms referring to another physician were submitted mistakenly for Patel is therefore harmless error.[3]

---

[3] In Defendant's Petition for Panel Rehearing, Defendant again argues that Defendant's convictions as to Counts 7 and 15 should be reversed, and asserts that "the Government cannot point to any forms (i.e. any allegedly false statements) actually submitted as to Dr. Patel." (Def. Pet. Panel Rehearing, 12.) Defendant is mistaken. The record contains an LCA and an I-129 form for each of the 7 physicians, including Patel, about whom Defendant was convicted of causing false statements to be made (for a total of 14 statements).

The LCA for Patel, which corresponds to Count 8, is dated July 14, 1998 and appears as the first page of Government Exhibit 8A. (J.A. 1946.) The I-129 form for Patel, which corresponds to Count 15, is dated July 14, 1998 and appears (somewhat confusingly) as the next three pages of Government Exhibit 8A. (J.A. 1947-49.) The LCA and I-129 form for Dr. Joshi, which correspond to Count 6 and Count 14, are dated March 20, 1998 and appear respectively as Government Exhibit 6A and 14A. Thus, the record supports Defendant's conviction for causing false statements to be made regarding both Patel and Joshi, and Defendant's argument with respect to Count 15 has no merit.

While the record supports Defendant's conviction as to making two false statements regarding Patel, Defendant was actually convicted of making three false statements regarding Patel. In addition to Counts 8 and 15, Defendant was also convicted of Count 7, for allegedly submitting a second false LCA regarding Patel. Defendant's conviction as to Count 7 may have been in error, because the LCA submitted as Government Exhibit 7A (for Count 7), allegedly the second LCA for Patel, appears to be an exact copy of the LCA submitted as Government Exhibit 6A (for

## B.    AMOUNT OF LOSS ATTRIBUTED TO DEFENDANT FOR SENTENCING

### 1.    Standard of Review

A court of appeals reviews *de novo* a sentencing court's interpretation of the Sentencing Guidelines, but must uphold a sentencing court's factual findings unless "clearly erroneous." *US v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002). A factual finding is "clearly erroneous" when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*. (citing *US v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

A sentencing court "need not determine the amount of loss with precision." *US v. Kohlbach*, 38 F.3d 832, 835 (6th Cir. 1994) (citations omitted). A sentencing court "need only make a reasonable estimate, given the available information." *US v. Guthrie*, 144 F.3d 1006, 1011 (6th Cir. 1998). A defendant who challenges such a computation must carry the burden of demonstrating "that the court's evaluation of the loss was not only inexact but outside the universe of acceptable computations." *US v. Tardiff*, 969 F.2d 1283, 1288 (1st Cir. 1992) (*cited in Kohlbach*, 38 F.3d at 841).

For sentencing purposes, a defendant will be held accountable for the actual or intended loss to a victim,

---

Count 7), the LCA for Joshi. Thus, it appears that a single document was used erroneously by the Government as the basis to convict Defendant for both Counts 6 and 7.

However, as this Court noted in our Opinion, any error with regard to Defendant's conviction as to Count 7 is "harmless." The district court did not attribute any loss to Defendant as to Counts 6 through 20. (Sentencing Tr. 84-86, J.A. 1096-98.) The district court sentenced Defendant to 27 months on each count to be served concurrently. (Sentencing Tr. 94-96, J.A. 1100-1101.) Therefore, Defendant's conviction as to Count 7 did not affect Defendant's sentence, and this Court properly considered any error with regard to Defendant's conviction for Count 7 to be harmless.

whichever is greater, or a combination thereof. *US v. Wade*, 266 F.3d 574, 586 (6th Cir. 2001). *See also* U.S.S.G. §2F1.1, comment. n.7. "[S]o long as the intended loss is supported by a preponderance of the evidence, the district court may use it in reaching the appropriate offense level." *US v. Logan*, 250 F.3d 350, 371 (6th Cir. 2001). In 2001, amendments to the Sentencing Guidelines clarified that "intended loss" means "the pecuniary harm that was intended to result from the offense" and "includes intended pecuniary harm that would have been *impossible* or unlikely to occur." §2B1.1, comment. n.3(A)(ii) (emphasis added).[4]

### 2. Loss Calculation

In this case, the only amounts of loss attributed to Defendant, and thus at issue on appeal, are $206,461.43 for Counts 1 and 4 and $50,393.53 for Count 3. Defendant argues the loss calculation for Counts 1 and 4 adopted by the district court is based on speculation. Defendant argues that there is no evidence that he ordered "all" encounter forms to be up-coded, that all of the encounter forms in the Government's sample were not up-coded, and that there was never an order to up-code new patient forms or to up-code defendant's encounter forms and that therefore neither of these should have been included in the loss calculation. Defendant argues the intended loss calculation as to Count 3 is clearly erroneous because it was allegedly impossible for him to inflict the amount of loss for which the district court held him accountable.

---

[4]This Court's reference to the 2001 amendments to the Sentencing Guidelines are inconsequential to this case because removing $50,393.53 from the loss calculation – an intended loss amount attributed to Defendant by the district court as to Count 3 that Defendant argues was impossible for him to inflict – would not have affected Defendant's offense level. Removing that amount would have resulted in a loss amount of $206,461.43, and the same 8 level increase in effect prior to the 2001 amendments.

Unlike the contentions of Defendant as to evidence regarding his conviction, his contentions regarding Counts 1, 4, and 3 relate only to sentencing procedures. Defendant was found guilty of the charges in these counts and our inquiry goes only to the amount of loss for which Defendant may be held accountable.

As to the loss calculation regarding Counts 1 and 4, Defendant contends there was no evidence that any order was given to up-code new patient CPT codes (the "9920-" series). The record shows otherwise:

Q. "Okay. Now, did he also give you orders to up-code a 99201 code to a higher-paying code?"
A. "We was [sic] told to up-code any office visit like that."

Q. "Okay. All Right. So he told you to code a 99201 up to the highest level that you could do, 99203?"
A. "Yes."

(Lainhart, Tr. 40-41.) Defendant suggests that his encounter forms were erroneously included in the loss calculation. However, the Government stated unequivocally at Defendant's sentencing hearing that "Dr. Raithatha's forms were not counted in the encounter forms for the 1999 figures that were given to the probation office." (Grise, Sentencing, Tr. 74.)

In addition, the selection of the ten most frequently billed insurance companies to provide figures upon which to compute average pay differences between CPT code categories was reasonable. Furthermore, Defendant's argument that all of the encounter forms in the Government's sample were not up-coded goes to actual loss, and therefore does not disturb the district court's calculation of intended loss. Finally, the use of the 1999 intended loss amount to calculate the lesser intended loss amounts for 1998 and 1997 was reasonable. Therefore, it was not clearly erroneous for

the district court to hold Defendant accountable for an intended loss of $206,461.43 as to 1 and 4. Defendant has failed to demonstrate that the loss calculation as to Counts 1 and 4 was "outside the universe of acceptable computations." *Kohlbach*, 38 F.3d at 841.

With regards to Count 3, Defendant argues that no loss should be attributed to him because he contends that it was impossible for him to have caused Medicare/Medicaid any loss by including the $50,393.53 in personal expenses on the cost report because his clinic had already reached its maximum reimbursement rate. (Appellant, Br. 62.) However, loss can be attributed to a Defendant based on a finding of actual loss or intended loss, and a finding of intended loss is not limited to those losses possible to inflict, or those gains possible for a Defendant to achieve. U.S.S.G. §2B1.1, comment. n.3(A)(ii).[5]

There was sufficient evidence to find that Defendant intended to mislead Medicare/Medicaid as to the $50,393.53 in personal expenses included on the cost report. It is unclear what difference Defendant anticipated the inclusion of his personal expenses would make in the amount Defendant's clinic was reimbursed for 1997, or in future reimbursement rates. However, where a defendant seeks to fraudulently pass off an amount of personal expenses as legitimate patient-related expenses, as in the present case, logic dictates that a defendant be held accountable for intending to cause the amount of loss about which he intentionally lied. Therefore, it was not clearly erroneous for the district court to hold

---

[5] As noted above, whether it was "possible" or "impossible" for Defendant to inflict a loss of $50,393.53 as to Count 3 is of no consequence. However, there is evidence in the record that the inclusion of Defendant's personal expenses on the cost report, even after the maximum reimbursement rate had been reached for the clinic, would have resulted in an actual loss for Medicare/Medicaid by way of an increase in future rates of reimbursement. (*See e.g.* Shreve, Tr. 100, J.A. 580; Scoggins, Tr. 173, J.A. 611.)

Defendant accountable for an intended loss of $50,393.53 as to Count 3.

**IV.    CONCLUSION**

For the above reasons, the conviction and sentence of the district court is AFFIRMED.