UNITED STATES of America, Plaintiff,

v.

Glenn A. BRUCE, Defendant.

No. 5:94CR0305.

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 14, 1995.

Charles T. Robinson, Mansfield, OH, for Glenn A. Bruce.

Robert William Kern, Office of the U.S. Attorney, Cleveland, OH, for U.S.

## SENTENCING ORDER

ANN ALDRICH, District Judge.

Glenn Bruce was a shareholder, director, and the executive vice-president of Crestline Building & Loan Association (CBL), a financial institution in Crestline, Ohio, which failed in 1992. A federal grand jury returned a 77-count indictment against Bruce for his role in the collapse of CBL. Bruce pled guilty to this Court to six counts of making false statements to a federal government agency (specifically, the Federal Home Loan Bank of Cincinnati (FHLBOC) and the Office of Thrift Supervision (OTS)) in violation of 18 U.S.C. § 1001, and one count of making false statements to the Federal Deposit Insurance Corporation (FDIC) in violation of 18 U.S.C. § 1007. The remaining counts are to be dismissed at the time of sentencing.

Bruce is now before the Court for a determination of his sentence. A presentence investigation report (PSR) was prepared, to which Bruce raises several objections. Bruce objects to the amount of the loss attributed to his conduct under the sentencing guidelines and to the conclusion that he substantially jeopardized the soundness of CBL. He also requests a downward departure. On October 16 and 17, 1995, this Court held a hearing and received evidence on these issues. For the reasons set forth below, Bruce is sentenced to 33 months incarceration, five years supervised release, $1,820,254.48 in restitution, 500 hours of community service, and a special assessment of $350.

## I.

The basic facts are not disputed. Bruce served as the executive vice president and managing officer of CBL. He was also a shareholder and a director. He was responsible for the day-to-day operations of the bank, and the bank employees all reported to him, either directly or indirectly.

When CBL's loan customers had difficulty repaying their loans, they were directed to Bruce. In particular, he handled the loan accounts of 26 of CBL's most delinquent customers. The uncontroverted evidence introduced at the hearing showed that he made numerous false entries in the loan account records of these borrowers.

For example, he would often have bank employees delete from the computer the interest principal due on the loan. In addition, Bruce would often capitalize the interest on these loans. In other words, he would add the interest due to the unpaid principal, so that the records would not reflect any overdue interest owed. As a result, the loan would not appear to be delinquent.

Bruce also rolled over delinquent loans into new loans. This entailed Bruce writing a new loan for a delinquent borrower for the total amount of principal and interest owing on the old debt. The customer would then use the proceeds from the new loan to pay off the old loan. In this way, delinquent loans were made to look current while the size of the debt kept increasing.

The effect of these false entries in the loan history records of these delinquent borrowers was to mislead bank examiners as to the actual financial status of CBL, because the delinquent loans were not properly classified as such. As a result, the loans were not properly charged off, the losses were not recognized, and sufficient reserves were not set aside. In addition, the false records were used to prepare quarterly reports to the FHLBOC and OTS. These reports were false and misleading.

Bruce also issued loans that were not adequately secured, i.e., the value of the collateral was less than the amount of the loan. If and when these loans became delinquent, the bank could not recoup the full amount due by foreclosing on the collateral, and had to take a loss.

The Office of Thrift Supervision (OTS) conducted a review of CBL's books, ending on September 25, 1990. It discovered some of these irregularities, although not their full extent. Following this examination, OTS and CBL entered into a supervisory agreement, dated July 10, 1991 (Gov.Ex. 3). The

supervisory agreement required CBL to improve its recordkeeping and documentation and to get approval from the OTS before issuing loans for commercial real estate, speculative residential construction, lines of credit, and consumer loans of more than $25,000. CBL also agreed to establish an independent asset review committee and develop a business plan to address the reported deficiencies.

The OTS examined CBL again in May of 1992. At this point, it was determined that CBL was failing and had insufficient capital to continue operating as a viable financial institution. After attempts were made to find a buyer for the bank, the Resolution Trust Corporation (RTC) assumed control of CBL. Bruce resigned from CBL on June 5, 1992.

CBL's own financial statements for the years 1991 and 1992, as well as the report prepared by the RTC, show that CBL lost approximately $3,400,000 when the delinquent loans were properly charged off in 1992. CBL's net assets fell from $1,300,000 to a negative $2,100,000.

The evidence at the hearing also revealed that Bruce is very highly regarded by his family and in the small community of Crestline. He has been married for 34 years, and has two children. He is very active in his church as a co-chairman of the financial committee and a deacon. The many character witnesses he called all described him as caring and compassionate. In fact, they maintained that if he had a flaw, it was that he was too compassionate. The Court has received a large number of letters from residents of Crestline urging the minimum sentence.

Bruce has also been active as a firefighter and EMT in Crestline. He started as a volunteer, and then moved to a full-time position after losing his job at CBL. He is credited with risking his own life to save the life of a gunshot victim, and he suffered a severe back injury when he was knocked off a ladder in the line of duty. He also has been diagnosed with atrial fibrillation.

The former employees of CBL who testified painted a somewhat less flattering picture of Bruce. They described him as dictatorial and prone to loud, angry outbursts, in which he would insult employees, slam doors and phones, and threaten to fire those who disagreed with his decisions. In addition, they stated that the employees were all somewhat in fear of him.

## II.

Prior to the hearing, a PSR was prepared, which made the following findings. The base offense level for all the counts to which Bruce pled guilty is six. United States Sentencing Commission, *Guidelines Manual,* § 2F1.1(a) (Nov. 1994). The parties agree to a two-level enhancement for more than minimal planning, U.S.S.G. § 2F1.1(b)(2), making the net offense level eight. The report concludes that Bruce's actions caused a loss to Crestline of approximately $3,400,000. Such a loss would result in a 13–level enhancement, making the new net offense level 21. U.S.S.G. § 2F1.1(b)(1)(N). Finally, the PSR concludes that Bruce's conduct "substantially jeopardized the safety and soundness of a financial institution." U.S.S.G. § 2F1.1(b)(6). This further increases the net offense level by four, to 25. *Id.*[1]

In addition, the parties agree to a two-level enhancement for abuse of a position of private trust, U.S.S.G. § 3B1.3, raising the offense level to 27. The parties also agree on a three-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1(a). This brings the final offense level to 24.[2]

Bruce has no prior criminal convictions, so he has zero criminal history points, which places him in criminal history category I. Applying the guidelines to this case, the imprisonment range would be 51–63 months. U.S.S.G. § 5A. The PSR recommends the minimum. The term of supervised release must be between three and five years, and

---

1. This subsection also requires that if the offense level is still less than 24 after the enhancement, it must be increased to 24. *Id.* Here, since the new level would be 25, this rule does not apply.

2. All the counts are in the same group, so there is no enhancement for multiple counts. U.S.S.G. §§ 3D1.2 and 3D1.4.

the PSR recommends the maximum. U.S.S.G. § 5D1.2(b)(1). Also according to the guidelines, Bruce is not eligible for probation. U.S.S.G. § 5B1.1. Even if he were eligible under the guidelines, he would be ineligible by statute, since a violation of 18 U.S.C. § 1007 is a class B felony, which precludes probation.

The guideline range for the fine would be $10,000 to $1,000,000. U.S.S.G. §§ 5E1.2(c)(3) and (4); 18 U.S.C. § 1007. The PSR recommends an additional fine amount to pay the costs of incarceration and supervised release, which are approximately $106,000. In determining Bruce's ability to pay, the government values Bruce's net assets at $74,434, with a monthly cash flow of $649. Of course, this includes income from Bruce's current job, which is $1,750 per month.

The PSR also recommends restitution. While the exact amount of the loss is yet to be determined, the recommendation is for restitution of $50,000. The special assessment is $350, which is $50 for each count. Finally, the PSR recommends 500 hours of community service.

## III.

### A. Fraudulent Conduct

■ Bruce raises several objections to the PSR. First, Bruce disagrees with the PSR's characterization of his conduct as fraudulent. He points out that he did not profit from the demise of CBL, which precludes a conclusion of fraudulent conduct. As an initial matter, this Court fails to understand what relevance this characterization has to Bruce's sentence. The guidelines of U.S.S.G. § 2F1.1 explicitly apply to the statutes which Bruce admitted violating, whether or not the conduct is characterized as fraudulent. U.S.S.G. § 2F1.1, comment. (stat. prov.). There is also no enhancement for "fraud." When questioned about this, counsel for Bruce stated that he wanted to make sure that the Court took into account that Bruce did not profit from his conduct. The Court is certainly cognizant of that fact, and will consider it with the other

relevant evidence in evaluating Bruce's request for a downward departure. See part III.D., infra.

Regardless of this objection's relevance, it is devoid of merit. Fraud is defined to include any deceit or trickery, or anything calculated to deceive, even if the perpetrator does not profit.[3] See Black's Law Dictionary 660 (6th ed. 1991); Random House College Dictionary 526 (rev. ed. 1980). Bruce's admitted conduct of lying to bank examiners to cover up CBL's losses certainly meets this definition.

### B. Amount of the Loss

■ Next, Bruce claims that he was not responsible for any of the losses at the bank, and so he should not receive any enhancement under U.S.S.G. § 2F1.1(b)(1). In calculating the enhancement under U.S.S.G. § 2F1.1(b)(1), the loss is the value of the money, property, or services unlawfully taken. Id., comment. (n. 7). The loss need not be determined with precision; instead, the Court need only make a reasonable estimate of the loss, given the available information. Id., comment. (n. 8); United States v. Milligan, 17 F.3d 177, 183 (6th Cir.1994). The government has the burden of establishing the amount of loss by a preponderance of the evidence. See United States v. Feinman, 930 F.2d 495, 500 (6th Cir.1991).

Bruce notes that he only pled guilty to lying about the losses, and argues that merely lying about existing losses could not cause such losses. He concludes that he is responsible for no loss whatsoever. However, this argument fails for two reasons.

■ First, the determination of the amount of the loss is not limited to the counts to which Bruce pled guilty. Rather, where the offenses should be grouped under U.S.S.G. § 3D1.2(d), the relevant conduct includes all acts and omissions committed by the defendant that were part of the same course of conduct as the offenses resulting in the conviction. U.S.S.G. § 1B1.3(a)(2). Here, the indictment charged Bruce with violating 18 U.S.C. §§ 1001, 1006, 1007 and

---

**3.** The generic use of the term fraud should be distinguished from common-law fraud, which re-

quires reasonable reliance on an intentional misrepresentation.

1341. These counts should be grouped under U.S.S.G. § 3D1.2(d) because they are all covered by U.S.S.G. § 2F1.1. *See* U.S.S.G. §§ 3D1.2(d) and 2F1.1, comment. (stat. prov.). In addition, these offenses are part of the same course of conduct, since they all involved Bruce's actions in altering the records of CBL. Therefore, the conduct charged in all the counts of the indictment should be used in determining the base offense level.

■ Second, even if only the false statements to which Bruce pled guilty were taken into account, all the bank examiners and accountants who testified at the hearing agreed that covering up the losses exacerbated them. Had the losses been properly reported, CBL would have set aside the necessary reserves to cover the losses. As a result, the future lending of CBL would have been restricted, thereby reducing the potential losses. In addition, no further loans would have been made to the delinquent customers, again reducing the loss. Therefore, it is clear that Bruce's false statements did in fact cause a loss to CBL.

Having determined that Bruce's conduct did in fact cause a loss to CBL, this Court now must establish the amount of the loss. While all the witnesses who testified agreed that the failure to properly report the delinquent accounts exacerbated the loss, none of them were willing or able to quantify that loss. In fact, each witness specifically stated that he or she could not even guess as to what the loss was because it was dependent on too many other factors.

A similar problem occurs when the deletion of interest and principal is examined. Bruce does not dispute that he did this, and the government has provided detailed records specifying exactly how much interest and principal was deleted. However, there was also testimony that interest should not accrue on delinquent accounts. If the accounts had been properly reported as delinquent, then there would have been no interest to delete. The government presented no evidence as to which deletions cost CBL money, and which deletions were of interest which should not have accrued. As a result,

it is difficult to make a reasonable estimate of loss from these numbers.

Similarly, the government has not proved that the principal deletions caused a loss. CBL lost money on the accounts on which Bruce deleted principal because the borrowers were unable to pay the money back and because the collateral was not sufficient to cover the balance. If the principal had not been deleted, CBL's recovery would not have been enhanced. Instead, the loans simply would have been properly classified as delinquent. While this delay exacerbated the loss, the government's witnesses were unable to quantify the amount of the loss caused by the delay.

This analysis applies equally to Bruce's practices of capitalizing interest and rolling over loans. If these loans should have been reported as delinquent, then there should have been no interest accruing to be capitalized. However, the capitalized interest on loans that were not delinquent should be counted as loss.

Because the general approaches to calculating the loss are not helpful, this Court will turn to a case-by-case approach. The government presented, through exhibits and testimony, evidence regarding the loan histories of some of the most delinquent borrowers. This evidence enables the Court to determine the loss caused by Bruce's conduct.

■ As an initial matter, Bruce objected through counsel at the hearing to the admission of any material in the exhibits which constituted double hearsay. However, the rules of evidence and hearsay do not apply to sentencing hearings. Fed.R.Evid. 1101(d)(3). Instead, the evidence may be admitted if the Court is satisfied that the evidence has sufficient indicia of reliability to support its probable accuracy. U.S.S.G. § 6A1.3(a); *United States v. Silverman*, 889 F.2d 1531, 1535 (6th Cir.1989). Here, many government witnesses testified as to the bases of these exhibits, including the underlying data and interviews they conducted. Much of this evidence was also corroborated by the testimony of employees of the bank and by Bruce's testimony on cross-examination. Therefore, this Court concludes that the evidence is sufficiently reliable to be considered.

■ Moving alphabetically through the delinquent borrowers, the first borrower is Bruce Armstrong. CBL lost $64,735.32 on three loans to Armstrong. The government has introduced no evidence showing that Bruce did anything illegal with regard to these loans, or that the loss was due to anything except bad business judgment. A sentence should not be enhanced for bad business judgment. Therefore, the government has not met its burden of proof in attributing this loss to Bruce.

■ The next customer is John Bauer. CBL lost $8,402.66 on two loans to him. Once again, the government has not presented any evidence of wrongdoing with regard to these loans, except that some interest was deleted. For the reasons stated above, it is not possible to conclude that the deletion of interest caused any loss. Therefore, this loss may not be attributed to Bruce.

■ Bruce also originated four loans to Flora and James Benedict. CBL lost $148,002.66 on these loans. These loans were used by the Benedicts to pay off their mortgage, and they gave no collateral for them. According to the Benedicts, Bruce had them sign blank notes and gave them whatever they wanted, even though they never made any payments on the principal. Bruce then apparently used the blank notes to issue new loans and used the proceeds to pay off the old ones. He also capitalized the interest to prevent the loans from appearing delinquent. Bruce therefore caused the original loss and then exacerbated it through his conduct, and this loss is attributable to his conduct.

■ CBL also lost $3,194.91 on two loans to Dawn Bivens. The government has not produced any evidence showing the reasons for this loss. Therefore, it has not met its burden of proof, and this loss cannot be attributed to Bruce.

■ CBL made a series of loans to Terry Bivens, on which it lost $180,479.91 because the loans were not secured by sufficient collateral. Bruce originated these loans and concealed both their existence and their unsecured status from the board of directors and federal regulators. Bruce knew that Bivens was having financial problems, and

made almost no payments after 1984, yet he continued to extend credit to Bivens. But for Bruce's illegal conduct, these loans would not have existed nor been extended so as to result in the loss. Therefore, this loss is attributable to Bruce.

CBL also lost $40,889.23 on three loans made to Ron and Samuel Durfee. The government proffers no explanation as to what caused this loss. It does offer evidence that Bruce deleted and capitalized interest on these loans. For the reasons given above, however, that is not sufficient to attribute the loss to Bruce.

Similarly, CBL made three loans to James Eckert, on which it lost $43,156.28. Again, the government failed to present any evidence regarding the cause of this loss, or Bruce's connection to it, except that interest was deleted. Therefore, the government has not met its burden of proof as to this loss.

Likewise, the government has offered no evidence connecting Bruce to a loan made to Raymond Fisher, except that Bruce deleted or capitalized interest. CBL lost $26,937.41 on this loan. Therefore, this loss may not be included in the loss computation.

■ CBL also made many loans to John Gear, on which it lost $42,631.54. Bruce made these loans to Gear, despite Gear's lack of collateral or income, and fraudulently listed Gear's place of business as a nonexistent body shop. Bruce also deleted or capitalized the interest on the loan. Therefore, this loss is attributable to Bruce.

Next, CBL lost $86,983.40 on four loans it made to Judith Gillette. Except for deletions of interest and principal, there is no evidence in the record describing what connection, if any, Bruce's conduct had to these losses. Therefore, these losses cannot be attributed to Bruce.

■ CBL also lost $203,977.90 on three loans to John Hoffman, who does business as Liberty Motors. While the evidence at the hearing indicated that Hoffman was a customer of Bruce's, there was contradictory testimony as to how well secured the loans really were. In addition, there is no evidence in the government's exhibits indicating

that Bruce's conduct was responsible for these losses. While it appears that Bruce may have exercised poor business judgment in this case, the government has not met its burden of proof in attributing these losses to Bruce.

■ CBL made many loans to Richard Keiser and his nephew, Ronald Keiser. Richard runs an ambulance service, while Ronald runs a livery business. CBL lost a total of $580,549.80 on these loans. Bruce fraudulently renewed these loans, increasing the balances, without the Keisers' knowledge. As a result, the total amount owing far outstripped both the Keisers' ability to pay and the value of the collateral. Because Bruce's fraudulent conduct directly caused these losses, they are attributable to him.

CBL also lost $151,702.97 on six loans to Hubert Metzger. Bruce originated these loans, many of which went to finance Metzger's restaurant venture. Metzger was always optimistic regarding the eventual success of the business. The government has not introduced any evidence of fraud in these loans except for capitalization of interest. Therefore, these losses may simply be due to Bruce's bad business judgment, and cannot be attributed to Bruce's fraudulent conduct.

■ CBL made ten loans to Francis Moyer, on which it lost $100,943.40. Moyer is an owner of Crestline Auto Recycling, which is a junkyard. The only evidence of wrongdoing the government produces is that Bruce rolled some of these loans over into new loans in violation of the supervisory agreement. For the reasons stated above, however, this is not sufficient to attribute the losses to his conduct.

■ CBL also lost $111,750.66 on five loans to Al Munroe. Munroe ran a video store which failed when he was arrested and incarcerated for illegally copying videos. Bruce originated these loans and concealed their existence from the board of directors and federal regulators, and even apparently concealed the existence of one of them from Monroe. In addition, Bruce approved additional loans for Munroe while he was delinquent on earlier loans and deleted principal and interest. In essence, Bruce created this loss by originating these loans improperly, and exacerbated it by issuing new loans, and so this loss is attributable to Bruce.

CBL lost $20,442.89 on one loan to John Phillips. The government has proffered no evidence that Bruce was connected to this loss in any way except through interest deletions, so it cannot be attributed to him.

■ CBL made twelve loans to Roy Price, on which it lost $219,757.41. Bruce concealed these loans from the board and regulators and fraudulently renewed them, increasing their balance. In fact, Price signed blank loan forms so that Bruce could renew them as necessary and prevent them from appearing delinquent. Bruce also deleted principal and deleted or capitalized interest and principal. Obviously, this conduct by Bruce both caused the original loss and increased it to its current proportions. Therefore, it is properly attributed to him.

CBL lost $2,706.97 on a loan to Sally Seasor. The government has submitted no evidence other than interest and principal deletions regarding Bruce's responsibility for this loss, so it may not be attributed to him.

■ CBL made at least thirteen loans to Stephen Shade, losing a total of $455,693.49. Many of these loans went to finance Shade's restaurant. The restaurant was never profitable and Shade wanted to give up, but Bruce persuaded him to keep it going. Bruce attempted to hide the loans from the board and the examiners, and manipulated them to prevent them from appearing as delinquent; this resulted in a rapid growth in the amount due and exacerbated the loss. Because Bruce originated these loans improperly and exacerbated the loss, this loss is attributable to him.

CBL made a large number of loans to Donald, Mark, and Stephen Spayde, on which it lost a total of $655,273.40. The Spaydes run a nursery and a furniture business. Other than interest and principal deletions, the government has produced no evidence of wrongdoing or fraud with regard to these loans. Therefore, this loss is not attributable to Bruce.

CBL made at least seven loans to Kevin Thomas, on which it lost $81,389.01. Thomas claimed to run an auto salvage business with Roy Price. However, Bruce admits that this business does not technically exist. These loans were supposedly secured by salvage titles to automobiles; however, the liens were not recorded. Bruce originated and renewed these loans without proper approval. Thomas aided in the renewal process by signing blank notes. He also told Bruce that he could not make any payments for two years, but Bruce told him not to worry and that he would work something out. Bruce also let Thomas sell the collateral to purchase other wrecks without collecting any of the proceeds. Clearly, Bruce is responsible for this loss, since he improperly originated the loans, manipulated them, and failed to protect CBL's interest in the collateral, causing the eventual loss.

CBL lost $86,268.76 on several loans made to John Troiano. Once again, other than principal and interest deletions, there is no evidence that Bruce did anything to cause this loss. Therefore, the government has not met its burden of proof and this loss cannot be attributed to Bruce.

CBL also lost $75,428.19 on two loans to John Vuich. Other than some deletions, the government did not produce any evidence of wrongdoing and did not show that Bruce's actions caused this loss. Therefore, it will not be attributed to Bruce.

Finally, CBL lost $29,649.10 on a loan to Richard Wagers. While Bruce did capitalize some of the interest on the loan, the government did not prove that his actions caused this loss. Therefore, it will not be attributed to him.

Adding together the individual losses which are a result of Bruce's conduct, the total loss is $1,820,254.48.[4] Because this loss is between $1,500,000 and $2,500,000, the proper increase in the base offense level is twelve. U.S.S.G. § 2F1.1(b)(1)(M). The Court's confidence in this estimate of the loss

is increased by Bruce's own testimony. When questioned by the Court under oath, Bruce admitted that his actions had resulted in a loss to CBL of between $900,000 and $1,000,000. Therefore, according to Bruce's own admission, he is responsible for enough loss to merit an increase in the offense level of eleven. U.S.S.G. § 2F1.1(b)(1)(L).[5]

## C. Jeopardizing the Soundness of a Financial Institution

Third, Bruce argues that his actions did not substantially jeopardize the safety and soundness of CBL. An offense is deemed to have substantially jeopardized the safety and soundness of a financial institution if, as a consequence of the offense, the institution became insolvent or was placed in substantial jeopardy of becoming insolvent. U.S.S.G. § 2F1.1, comment. (n. 15). Here, it is unquestioned that CBL became insolvent and was taken over by the RTC. Therefore, the question is whether this occurred as a result of Bruce's conduct.

Once again, Bruce argues that he merely covered up existing losses, so that he was not a cause of Crestline's insolvency. As noted above, however, Bruce's conduct did cause a loss of over $1,800,000. At first glance, this would appear to have substantially jeopardized the soundness of CBL, since CBL only had a net worth of $1,300,000 before this loss.

However, the government's own witness cast substantial doubt on whether Bruce's conduct caused the collapse of CBL. Frank Lepa of the OTS testified that, but for Bruce's conduct in covering up the losses, the OTS would have closed CBL down two years earlier. However, because Bruce covered up the losses, OTS was unaware of its true financial state. Logically, then, Bruce's conduct cannot be said to have contributed to the collapse of CBL, because it would have collapsed even if he had scrupulously fol-

---

4. This is not to say that Bruce is conclusively not responsible for more, or even all, of the loss. However, the government has not *proved* Bruce's responsibility by a preponderance of the evidence.

5. In fact, whether the increase in the offense level is eleven or twelve is of no consequence, because the sentence is within the guideline range for either outcome. *See* part IV, *infra.*

lowed the law.[6] In fact, Bruce's conduct kept CBL open longer, although it exacerbated CBL's losses. Lepa's testimony was not contradicted. Therefore, the government has not met its burden of showing that Bruce substantially jeopardized the safety and soundness of a financial institution, so there is no enhancement under U.S.S.G. § 2F1.1(b)(6), and Bruce's objection is well taken.

## D. Downward Departure

Finally, Bruce requests a downward departure. He puts forth as reasons for a departure his community service, his illness (atrial fibrillation), and the fact that he was motivated by compassion and did not profit from the fail of CBL. The Court will deal with each of these reasons in turn.

■ First, Bruce argues that his service to his church and his community justify a downward departure. The Court has received many letters from residents of Crestline testifying to Bruce's involvement in the community, especially as a firefighter. Bruce has certainly been generous with both his time and his money. However, while such involvement is laudable, it does not justify a downward departure. Departures for unusual factors are only justified where the factors are substantially in excess of that which is ordinarily involved in the offense of conviction. *United States v. Kohlbach*, 38 F.3d 832, 838 (6th Cir.1994). As the Sixth Circuit has noted, white collar criminals such as Bruce are typically involved as leaders "in community charities, civic organizations, and church efforts." *Id.* Such activities do not justify a downward departure.

In a related vein, Bruce attempted to establish at the hearing that he might not be able to regain his job as a firefighter if he were sentenced to a prison term. Given the glowing testimony from the fire captain and others in Crestline who offered him jobs after he resigned from CBL, this Court has no doubt that Bruce will have many opportunities to return to gainful employment after he has finished paying his debt to society.

■ Second, Bruce argues that he should receive a downward departure due to his physical condition. Physical condition is only grounds for a departure where the impairment is extraordinary. U.S.S.G. § 5H1.4. Here, Bruce suffers from atrial fibrillation. This condition can be controlled through medication and does not prevent its sufferers from leading active lives, or even being President of the United States; it is hardly extraordinary. This Court also notes that excellent medical facilities are available in the federal prison system and concludes that Bruce's physical condition does not justify a departure.

■ Finally, Bruce argues that the offense level is overstated because he did not profit from his actions and because he was motivated by compassion for those who could not pay their debts. It is unquestioned that Bruce did not profit financially from the collapse of CBL. However, he did profit in other ways. At the sentencing hearing, the chief of police of Crestline, Chief Smith, testified as to what a wonderful person Bruce is. On cross-examination, he admitted that Bruce had arranged a loan for him through CBL. Smith only had to put up his car as collateral, even though it was valued at less than the amount of the loan. Similarly, Nancy Eckert testified for Bruce. She and her husband, James, were friendly with the Bruces through church. She stated that Bruce had given them a break and reduced their mortgage payments when her husband had become unemployed. However, Bruce never increased the payments again when her husband got his job back. In summary, while Bruce did not personally profit financially from his conduct, his friends did.

Bruce argues that he simply had compassion for his neighbors. Compassion for one's neighbors is certainly an admirable trait, especially when one digs deep into one's own resources of time and money. However, compassion which is exercised by dipping into the funds of others ceases to be admirable; rather, it is theft. Here, Bruce used the

---

**6.** This testimony is also supported by this court's finding as to the amount of the loss. There are losses of at least $1,500,000 which cannot be attributed to Bruce. Given CBL's net assets of $1,300,000, these losses would theoretically have been enough to cause the collapse of CBL.

funds of depositors, insured by federal taxpayers, to shower his neighbors with compassion. While his neighbors may appreciate him for this behavior, it does not qualify him for a downward departure.

### IV.

Having resolved Bruce's objections, this Court must apply the guidelines to determine the sentence. The base offense level is six. U.S.S.G. § 2F1.1(a). There is a twelve-level enhancement for the loss, U.S.S.G. § 2F1.1(b)(1)(M), and a two-level enhancement for more than minimal planning. U.S.S.G. § 2F1.1(b)(2). This brings the net offense level to 20. There is also a two-level enhancement for abuse of a position of trust, bringing the level to 22. U.S.S.G. § 3B1.3. Finally, there is a three-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1. Thus, the final offense level is nineteen.

With a final offense level of nineteen and criminal history category I, the guideline range for imprisonment is 30–37 months. This Court sentences Bruce to 33 months incarceration. The range for supervised release is three to five years, and the Court sentences Bruce to five years of supervised release to follow incarceration, with the normal conditions attached.

The final issue is the amount of restitution and fines Bruce must pay. As an initial matter, the RTC (and, therefore, federal taxpayers) lost $1,820,254.48 as a result of Bruce's conduct. Therefore, Bruce is ordered to make restitution in that amount. Recognizing, however, that Bruce is unlikely to ever be able to pay this amount, payment of restitution is not a condition of the end of supervised release. Rather, the end of supervised release is conditioned upon Bruce making a good faith effort to make restitution. The range for the fine is $6,000 to $1,000,000. U.S.S.G. § 5E1.2(c)(3) and (4); 18 U.S.C. § 1007. However, given the great likelihood that Bruce will be unable to pay any fine in addition to restitution, the fine will be waived. U.S.S.G. § 5E1.2(f). In lieu of the fine, the Court sentences Bruce to 500 hours of community service. Finally, the special assessment is $350.

### V.

For the foregoing reasons, the defendant, Glenn A. Bruce, is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 33 months; Bruce is to self-report before January 15, 1996. Upon release from imprisonment, Bruce shall be placed on supervised release for a term of five years. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released. While on supervised release, the defendant shall not commit another federal, state, or local crime, and shall comply with all the standard conditions that have been adopted by this Court. The conclusion of supervised release is not conditioned upon Bruce making full restitution; rather it is conditioned on Bruce making a good-faith effort at restitution.

Bruce is ordered to make restitution in the amount of $1,820,254.48, or the balance of that not paid during imprisonment, to the Resolution Trust Corporation, P.O. Box 419570, Kansas City, Missouri 64141, Attention Jean Lewis or Al Cole. Restitution is payable during the period of imprisonment through the B.O.P. Inmate Financial Responsibility Program.

Bruce is also ordered to perform 500 hours of community service as directed by the probation office. The community service is to be performed at a rate of not less than 100 hours per year. Bruce is required to pay the $150.00 start-up fee. Finally, Bruce is ordered to pay a special assessment of $350 which is due at the time of sentencing.

IT IS SO ORDERED.